# CALIFORNIA STATE BOARD OF EQUALIZATION *v.* SIERRA SUMMIT, INC.

No. 88–681.   Argued April 19, 1989—Decided June 12, 1989

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 854.

*Robert F. Tyler*, Supervising Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs was *John K. Van de Kamp*, Attorney General.

*David Ray Jenkins* argued the cause and filed a brief for respondent.*

JUSTICE STEVENS delivered the opinion of the Court.

Enmeshed in a tangled skein of procedural and state-law issues is a ruling on an important federal question that was critical to the decision of the Court of Appeals in this case. The court's ultimate holding was that a Bankruptcy Court's in-

---

*\**Benna Ruth Solomon, Beate Bloch*, and *Thomas D. Goldberg* filed a brief for The National Governors' Association et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the First National Bank of Boston et al. by *Frederick A. Richman, M. Randall Oppenheimer, Alan Rader*, and *Daniel M. Glosband;* and for Kenneth L. Spears, Trustee, Hughes Drilling Co. by *David W. Lee* and *Gregory A. McKenzie.*

junction against the assessment of a state sales tax upon the proceeds of a trustee's liquidation sale of an inventory of skis also barred the collection of a use tax from the purchaser's lessees. In the process of reaching its decision, the Ninth Circuit rejected an argument that a case well known to California bankruptcy lawyers as *"Goggin II"*[1] was wrongly decided. The three-judge panel that heard the case concluded that it was not within its power—"and not within its heart— to change a rule of this circuit that has been in force for over thirty years." *In re China Peak Resort*, 847 F. 2d 570, 572 (1988). Because the rule of *"Goggin II"* conflicts with the rule applied in other Circuits,[2] and because we have both the power and the duty to resolve the conflict, we granted certiorari. 488 U. S. 992 (1988).[3]

---

[1] *California State Board of Equalization* v. *Goggin*, 245 F. 2d 44 (CA9), cert. denied, 353 U. S. 961 (1957). The case known as *"Goggin I"* is *California State Board of Equalization* v. *Goggin*, 191 F. 2d 726 (CA9 1951), cert. denied, 342 U. S. 909 (1952).

[2] Compare *In re Hatfield Construction Co.*, 494 F. 2d 1179 (CA5 1974) (holding that sales tax can be imposed on liquidation sale); *In re Leavy*, 85 F. 2d 25 (CA2 1936) (same), with *In re Cusato Brothers Int'l, Inc.*, 750 F. 2d 887 (CA11) (holding that bankruptcy trustee is not liable for excise taxes), cert. denied *sub nom. Florida* v. *Great American Bank of Broward County*, 472 U. S. 1010 (1985). See also *In re Warmings A. G. Food Center*, 50 B. R. 748 (Bkrtcy. Ct. Me.), summarily aff'd, 782 F. 2d 1024 (CA1 1985); *In re Sunrise Construction Co.*, 39 B. R. 668 (Wyo. 1984); *In re Hughes Drilling Co.*, 75 B. R. 196 (Bkrtcy. Ct. WD Okla. 1987); *In re Hubs Repair Shop, Inc.*, 28 B. R. 858 (Bkrtcy. Ct. ND Iowa 1983) (all holding that States can tax liquidation sales), and *In re Sheldon's Inc. of Maine*, 28 B. R. 568 (Bkrtcy. Ct. Me. 1983); *In re Rhea*, 17 B. R. 789 (Bkrtcy. Ct. WD Okla. 1982) (holding that States cannot tax liquidation sales).

[3] In its brief on the merits, respondent argues that the judgment of the Bankruptcy Court that States may not impose taxes on a liquidation sale is res judicata and therefore not properly before us. Petitioner argued that the *Goggin* cases were incorrectly decided before the Court of Appeals, see Brief for Appellant in No. 87–2542 (CA9), pp. 28–33, however, and that court reached the merits of the question. At no time previous to its brief on the merits before this Court did respondent argue that the question

The *Goggin* cases concerned the attempt by the California State Board of Equalization, petitioner here, to assess sales and use taxes on a bankruptcy liquidation sale. In *Goggin I*, 191 F. 2d 726 (1951), cert. denied, 342 U. S. 909 (1952), the Court of Appeals for the Ninth Circuit rejected the Board's attempt to assess a nondiscriminatory sales tax imposed on retailers to a liquidation sale made by a bankruptcy trustee under court order. Although the court based its decision on a construction of state law that excluded the trustee from the definition of retailer, Judge Fee in concurrence wrote that the assessment constituted an unlawful tax upon court processes. Six years later, Judge Fee, writing for the Circuit panel in *Goggin II*, made those views law. 245 F. 2d 44, cert. denied, 353 U. S. 961 (1957). At issue was a California law which required the bankruptcy trustee to collect and remit use taxes imposed on the use of goods from a liquidation sale on which no sales tax had been paid. The court held the tax unlawful, finding that while it was nondiscriminatory it nonetheless burdened the "essential processes" of the bankruptcy court.

The *Goggin* opinions were based on two premises, each of which respondent argues supports the judgment here. First, the court held that a tax on liquidation sales places a burden on the federal function of the bankruptcy court and therefore violates principles of intergovernmental tax immunity first recognized in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). Second, it found that a federal statute specifically authorizing the States to impose taxes on business operations of the bankruptcy trustee negated by implication their power to tax bankruptcy liquidations. Neither argument is persuasive.

---

might not be properly presented. In these circumstances we may decide the question decided by the Court of Appeals. See *Canton* v. *Harris*, 489 U. S. 378, 383–385 (1989); *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 815–816 (1985); see also *Donovan* v. *City of Dallas*, 377 U. S. 408, 414 (1964).

The argument that a tax on a bankruptcy liquidation sale places an undue burden on a governmental operation derives from the once established view that a state tax on income or assets an individual receives from a contract with the Federal Government constituted a tax on the contract and thereby imposed a burden on governmental operations. See, *e. g.*, *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218 (1928); *Collector* v. *Day*, 11 Wall. 113 (1871); *Dobbins* v. *Commissioners of Erie County*, 16 Pet. 435 (1842); *Weston* v. *City Council of Charleston*, 2 Pet. 449 (1829). The Court drew a distinction between a tax imposed on a Government agent's property and a tax imposed on its operations. While the former was permissible, the latter was constitutionally proscribed. See, *e. g.*, *Railroad Co.* v. *Peniston*, 18 Wall. 5, 33 (1873); *McCulloch* v. *Maryland*, 4 Wheat., at 345; see also *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 163 (1937) (footnotes omitted) (Roberts, J., dissenting) ("No tax can be laid upon th[e] franchises or operations [of government instrumentalities], but their local property is subject to non-discriminating state taxation"). Thus, although this Court held as early as 1904 that States could impose a property tax on a bankruptcy estate, see *Swarts* v. *Hammer*, 194 U. S. 441 (1904), other courts reasonably concluded that the State could not tax the operations of the bankruptcy trustee. See, *e. g.*, *In re Flatbush Gum Co.*, 73 F. 2d 283 (CA2 1934), cert. denied *sub nom. New York* v. *Arnold*, 294 U. S. 713 (1935).

In *James* v. *Dravo Contracting Co.*, 302 U. S. 134 (1937), however, this Court rejected the distinction between a tax on the property of an agent and a tax on the agent's operations. With the Court's decision in *Dravo Contracting*, "the doctrine of intergovernmental tax immunity started a long path in decline and [it] has now been 'thoroughly repudiated.'" *Cotton Petroleum Corp.* v. *New Mexico, ante*, at 174 (quoting *South Carolina* v. *Baker*, 485 U. S. 505, 520 (1988)). "[U]nder current intergovernmental tax immunity doctrine the States can never tax the United States directly but can

tax any private parties with whom it does business, even though the financial burden falls on the United States, as long as the tax does not discriminate against the United States or those with whom it deals." *Id.*, at 523. Absolute tax immunity is appropriate only when the tax is on the United States itself "or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *United States* v. *New Mexico*, 455 U. S. 720, 735 (1982).

It is evident that whatever immunity the bankruptcy estate once enjoyed from taxation on its operations has long since eroded and that there is now no constitutional impediment to the imposition of a sales tax or use tax on a liquidation sale. There is no claim, nor could there be, that the tax discriminates against bankruptcy trustees or those with whom they deal. As Judge Augustus Hand observed on similar facts in 1936: "The purchaser at the judicial sale was only required to pay the same tax he would have been bound to pay if he had purchased from anyone else." *In re Leavy*, 85 F. 2d 25, 27 (CA2).[4] Nor is the bankruptcy trustee so closely connected to the Federal Government that the two "cannot realistically be viewed as separate entities." *United States* v. *New Mexico, supra*, at 735. The bankruptcy trustee is "the representative of the estate [of the debtor]," 11 U. S. C. § 323(a); cf. *Commodity Futures Trading Comm'n* v. *Weintraub*, 471 U. S. 343 (1985), not "an arm of the Government," *Department of Employment* v. *United States*, 385 U. S. 355, 359–360 (1966), and the tax on the estate is an administrative

---

[4]Judge Hand added:

"What the trustee is really complaining of is, not that a burden has been imposed upon the exercise of his functions, but of his inability to sell to a purchaser who would be exempt from a tax and because of such an exemption would pay a higher price to him than would ordinarily be paid for the goods sold. It seems unreasonable to treat the absence of an exemption from taxes as a burden upon the normal exercise of a governmental function." 85 F. 2d, at 27.

expense of the debtor, not of the Federal Government, 11 U. S. C. § 503(b)(1)(B) (1982 ed. and Supp. V). Cf. *Missouri* v. *Gleick*, 135 F. 2d 134, 137 (CA8 1943).[5] For the purposes of absolute tax immunity under the intergovernmental tax immunity doctrine, there is no material distinction between those municipal and state withholding and property taxes on the bankruptcy trustee which we have upheld, see *Otte* v. *United States*, 419 U. S. 43, 52–54 (1974); *Swarts* v. *Hammer*, 194 U. S., at 444, and the tax on the liquidation sale presented here.[6]

The *Goggin* courts also based their proscription of state sales and use taxes on an implied prohibition that they found

---

[5] Under 11 U. S. C. § 346(c)(2) (1982 ed., Supp. V), the trustee is required to "make any tax return otherwise required by State or local law to be filed by or on behalf of" a corporation or partnership in bankruptcy "in the same manner and form as such corporation or partnership, as the case may be, is required to make such return."

It follows, *a fortiori*, that when, as in this case, the debtor is permitted to remain in possession, the same duties may be imposed on the debtor-in-possession. See 11 U. S. C. § 1107(a) (1982 ed., Supp. V) (debtor-in-possession shall perform all the functions and duties of trustee).

[6] The commentators are in agreement. See Wurzel, Taxation During Bankruptcy Liquidation, 55 Harv. L. Rev. 1141, 1166–1169 (1942) (footnote omitted) ("[T]here is no implied immunity of a federal instrumentality from a state tax that is general and nondiscriminatory if its effects upon the Federal Government are merely 'incidental.' A general and nondiscriminatory tax on a trustee fulfills this requirement. . . . The tax does not place a financial burden upon the United States; nor will it — unless it is discriminatory and therefore unconstitutional — render the trustee's task more difficult or cumbersome"); Note, State Taxation of Bankruptcy Liquidations: Federalism Misconceived, 67 Yale L. J. 335, 340 (1957) (footnotes omitted) ("Case law suggests that a sales or use tax should be upheld even in the absence of an applicable federal waiver. The immunity of one sovereign from taxation by another originated in the belief that the taxing power is necessarily destructive. This rationale has been repudiated, and *Graves* [v. *New York ex rel. O'Keefe*, 306 U. S. 466 (1939),] indicates that only taxes which can be so manipulated should be invalidated. Absent discriminatory application against sellers and buyers at liquidation sales, a sales or use tax should not seriously impede the federal bankruptcy process").

in 28 U. S. C. § 960.[7]  The *Goggin II* court read § 960 as setting forth "the sole area where the state is permitted to impose a tax of any type" and reasoned that because Congress had not specifically granted the States authority to impose sales and use taxes on liquidation, "essential sales in liquidation [were] inevitably free from such imposition." 245 F. 2d, at 46.  That view is contrary to our general approach to claims that the States' power to tax have been pre-empted and to the plain meaning and legislative history of this particular statutory provision.

Although Congress can confer an immunity from state taxation, see *Washington* v. *United States*, 460 U. S. 536, 540 (1983); *First Agricultural Nat. Bank* v. *State Tax Comm'n*, 392 U. S. 339 (1968); *United States* v. *City of Detroit*, 355 U. S. 466, 474 (1958), we have stated that "[a] court must proceed carefully when asked to recognize an exemption from

---

[7] Title 28 U. S. C. § 960 provides:

"Any officers and agents conducting any business under authority of a United States court shall be subject to all Federal, State and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation."

The original provision, as passed by Congress in 1934, provided:

"That any receiver, liquidator, referee, trustee, or other officers or agents appointed by any United States court who is authorized by said court to conduct any business, or who does conduct any business, shall, from and after the enactment of this Act, be subject to all State and local taxes applicable to such business the same as if such business were conducted by an individual or corporation: *Provided, however,* That nothing in this Act contained shall be construed to prohibit or prejudice the collection of any such taxes which accrued prior to the approval of this Act, in the event that the United States court having final jurisdiction of the subject matter under existing law should adjudge and decide that the imposition of such taxes was a valid exercise of the taxing power by the State or States, or by the civil subdivisions of the State or States imposing the same." Act of June 18, 1934, ch. 585, 48 Stat. 993.

The changes in language were made in 1948 as part of the general revision of the Judicial Code and impart no significant change in meaning.  See *Finley* v. *United States, ante,* at 554.

state taxation that Congress has not clearly expressed," *Rockford Life Ins. Co.* v. *Illinois Dept. of Revenue,* 482 U. S. 182, 191 (1987). See also *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598, 607 (1943); *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 479 (1939). Section 960 is not such a clear expression of an exemption from state taxation. It was passed in 1934, at the height of the intergovernmental tax immunity doctrine, in response to a Federal District Court decision holding that a bankruptcy receiver operating a gasoline and oil distributing business was not liable as a matter of state law for a state sales tax on motor fuel. See H. R. Rep. No. 1138, 73d Cong., 2d Sess. (1934); S. Rep. No. 1372, 73d Cong., 2d Sess. (1934).[8] Read most naturally, the statute evinces an intention that a State be permitted to tax a bankruptcy estate notwithstanding any intergovernmental immunity objection that might be interposed, cf. *Davis* v. *Michigan Dept. of Treasury,* 489 U. S. 803, 813 (1989), and that, as a matter of federal law, "a business in receivership, or conducted under court order, should be subject to the same tax liability as the owner would have been if in possession and operating the enterprise," *Palmer* v. *Webster and Atlas Nat. Bank of Boston,* 312 U. S. 156, 163 (1941).[9] The statute "indicates a Congressional purpose

---

[8] See also 78 Cong. Rec. 6656 (1934) (statement of Rep. McKeown) ("A great many receivers in oil cases have been held by the court not liable to pay taxes. They do not pay the gasoline taxes to the State. There are thousands of dollars being lost to the State, because these receivers in gasoline and oil cases are not liable to pay those taxes. In the receivers for bank cases they do not have to pay the taxes to the State"). Ironically, the District Court decision in *Howe* v. *Atlantic, Pacific & Gulf Oil Co.,* 4 F. Supp. 162 (WD Mo. 1933), that precipitated passage of the Act was reversed on state-law grounds even before the Act was signed into law. See *Kansas City* v. *Johnson,* 70 F. 2d 360 (CA8), cert. denied, 293 U. S. 617 (1934).

[9] "If the terms of the Louisiana statute had specifically provided for the levy of a tax against the trustee or receiver, there could be no doubt that the trustee would be liable for the franchise tax. There were controversies between state taxing authorities and the various liquidating agencies

to facilitate—not to obstruct—enforcement of state laws."
*Boteler* v. *Ingels*, 308 U. S. 57, 60–61 (1939). Nothing in the
plain language of the statute, its legislative history, or the
structure of the Bankruptcy Code indicates that Congress in-
tended to exclude taxes on the liquidation process from those
taxes the States may impose on the bankruptcy estate.

Eighty-five years ago, in *Swarts* v. *Hammer*, 194 U. S.
441 (1904), we held that property in the hands of a bank-
ruptcy trustee was subject to taxation by state and municipal
authorities. The appellant in that case argued, in much the
same manner as respondent does here, that the transfer of
assets to a bankruptcy trustee vested the Federal Govern-
ment with exclusive control of the bankruptcy estate and that
"no other sovereignty, be it State or foreign, is permitted to
exercise any power that burdens or in any manner interferes
with the distribution prescribed by the act." Statement,
Specification of Error and Argument for Appellant in *Swarts*
v. *Hammer*, O. T. 1902, No. 238, p. 4. We responded that
"[b]y the transfer to the trustee no mysterious or peculiar
ownership or qualities are given to the property," and that
"there is nothing in that to withdraw it from the necessity of
protection by the State and municipality, or which should ex-

appointed by the Federal courts as to the liability for such taxes. Con-
gress has, in the interest of justice or good will, by this Act directed the
trustee to pay rather than litigate these tax claims. By the sweeping
terms of this statute all doubts have been resolved in favor of the state
taxes." *Thompson* v. *State of Louisiana*, 98 F. 2d 108, 111 (CA8 1938).
See also 3A Collier on Bankruptcy § 62.14, p. 1526 (14th ed. 1975) ("The
true meaning of the Act of June 18, 1934, would seem to be a declaration
of policy: if States decide not to exempt from tax a business conducted
by the officer of a federal bankruptcy court, such tax should be paid and
bankruptcy, though governed by federal law, should not be raised as a de-
fense, allowing bankrupt businesses to compete at an advantage with non-
bankrupt businesses"); Pepper, Application of State Franchise Taxes to
Trustees in Bankruptcy, 14 Taxes 259 (1936) ("All that Congress said in its
enactment is that if a state imposes a tax upon a trustee, he cannot claim
exemption by reason of the fact that he is a trustee").

empt it from its obligations to either." 194 U. S., at 444. If Congress wished to declare otherwise, its intent would have to "be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt." *Ibid.* The law that has intervened in the last 85 years, rejecting any distinction between a tax on property and a tax on operations, only gives force to our conclusion that the intergovernmental tax immunity doctrine does not proscribe the tax sought to be assessed here.

We therefore vacate the judgment of the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The Court today, overturning a 32-year-old Court of Appeals decision, settles a Circuit conflict of ancient vintage and doubtful urgency in a case where the question decided is not properly presented. Although the majority may well be correct that *California State Board of Equalization* v. *Goggin,* 245 F. 2d 44 (CA9) *(Goggin II),* cert. denied, 353 U. S. 961 (1957), is not good law, I respectfully dissent from the majority's resolution of an issue that is res judicata in this litigation.

The history of this case, notably missing from the majority opinion, has its genesis in 1980, when China Peak Resort, Ltd., filed for Chapter 11 bankruptcy relief. After a variety of proceedings, the receiver, Robert T. Ford, entered into negotiations with Snow Summit Ski Corporation and respondent Sierra Summit, Inc., its wholly owned subsidiary, for the sale of China Peak's assets. See *In re China Peak Resort,* 847 F. 2d 570, 571 (CA9 1988). The sale was consummated with the approval of the Bankruptcy Court, and China Peak dismissed its bankruptcy petition. After the sale, petitioner Board attempted to assess the debtor's prin-

cipals and Mr. Ford for taxes on the sale of China Peak's assets to Snow Summit. The bankruptcy trustee moved to reopen the bankruptcy case and filed an adversary proceeding on his own behalf and on behalf of the debtor, seeking to bar the tax assessment. After full briefing, the Bankruptcy Court found that the sale amounted to a liquidation of the China Peak estate and that, therefore, a tax on the sale was prohibited by *Goggin II*. *In re China Peak*, Advisory Proceeding No. 183–0344 (Bkrtcy. Ct. ED Cal. 1983), App. to Pet. for Cert. A–27. The Bankruptcy Court's judgment prohibited the Board from assessing or enforcing any tax against the trustee, China Peak, its principals, or other parties "by reason of the sale of the assets of China Peak Resort, Ltd. to Snow Summit." *Id.*, at A–28. *Petitioner did not appeal this 1983 judgment,* and it became final when the time for appeal expired later that year.

The instant case arose when petitioner attempted to assess a use tax against Sierra Summit for revenues collected from the rental of ski equipment obtained in the China Peak sale. Sierra Summit claimed that the 1983 order precluded the assessment of these taxes and sought enforcement of the injunction. The Court of Appeals ultimately granted Sierra Summit relief, remanding the case to the Bankruptcy Court with instructions to issue a contempt citation against petitioner. 847 F. 2d, at 572–573.

Petitioner now argues to this Court, and the majority agrees, that *Goggin II*—the legal basis for the order from which the contempt arises—was wrongly decided. In my view, petitioner's challenge to the wisdom of *Goggin II* comes far too late. Petitioner had ample opportunity to challenge the continuing validity of *Goggin II* in the litigation resulting in the 1983 order, but failed to appeal the adverse judgment. That final judgment, and the legal precedents underlying it, are not now subject to collateral attack in these contempt proceedings. This Court in *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394 (1981), wrote:

"A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. . . . Nor are the res judicata consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Id.*, at 398.

In *Maggio* v. *Zeitz*, 333 U. S. 56 (1948), the Court applied these principles in a situation strikingly similar to the case at hand. There, in an appeal from a contempt order, the losing party attempted to challenge the merits of the judgment that he violated. The Court refused to hear the challenge because, "when completed and terminated in a final order, [the decision] becomes *res judicata* and not subject to collateral attack in the contempt proceedings." *Id.*, at 68. The Court elaborated:

"It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. . . . [W]hen [an order] has become final, disobedience cannot be justified by re-trying the issues as to whether the order should have been issued in the first place." *Id.*, at 69.

None of the cases cited by the majority as authorizing its race to the merits persuades me to set aside these time-honored principles of appellate review. See *ante*, at 846–847, n. 3. Neither *Canton* v. *Harris*, 489 U. S. 378 (1989), nor *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985), concerned the doctrine of res judicata. *Donovan* v. *City of Dallas*, 377 U. S. 408 (1964), did involve review both of a contempt citation and of the order underlying the contempt. In contrast to this case, however, the Court in *Donovan* did not reach the merits of a final underlying order as part of its review of a contempt citation. Rather, the Court simultaneously

granted Donovan's petition for certiorari seeking review of the underlying State Supreme Court injunction *and* his separate petition seeking review of the subsequent contempt conviction. *Id.*, at 411. Far from revisiting the merits of an unappealed judgment, the Court in *Donovan* reviewed the underlying judgment itself in the ordinary course of business.

Accordingly, in my view, the only issue properly before the Court is the application of the 1983 order to the facts underlying the issuance of the contempt citation. Although of obvious importance to the parties, this wholly case-specific inquiry does not merit this Court's attention, and I would dismiss the writ of certiorari as having been improvidently granted.